IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED
03 FEB 28 PM 4: 03
U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| SHARON ROGERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Civil Action Number |
| YOUNG WOMEN'S CHRISTIAN | ) | 01-C-0661-S |
| ASSOCIATION, SUZANNE DURHAM, | ) | |
| JENNIE INGRAM, STACY BARNETT, | ) | |
| SANDGUARD, INC., and | ) | |
| EDWARD SANDERS, | ) | |
| | ) | |
| Defendants. | ) | |

ENTERED
MAR 3 2003

**MEMORANDUM OPINION**
**GRANTING SUMMARY JUDGMENT**

The present action was initiated by plaintiff, Sharon Rogers ("Rogers"), against the Young Women's Christian Association ("YWCA"), as well as past or current YWCA employees Suzanne Durham, Jennie Ingram, and Stacy Barnett. Rogers also asserts claims against Sandguard, Inc., a security service hired by the YWCA, and Edward Sanders, the owner of Sandguard. Rogers, who is black, alleges that the YWCA discriminated against her on the basis of race when it disciplined her and ultimately terminated her. *See* 42 U.S.C. § 1981. Rogers also brings claims against all defendants under Alabama law for defamation, intentional infliction of emotional distress, and negligent hiring, training and supervision.

Presently before the Court is the YWCA's motion for summary judgment on all claims.

asserted by Rogers. The Court finds that the YWCA's motion is due to be granted. Inasmuch as Rogers failed to effect service on the remaining defendants, all claims asserted against those defendants are due to be dismissed.

## I. FACTS

A.  **The Court Advocate Position**

Rogers was employed by the YWCA as a Court Advocate from August 1999 until the YWCA terminated her employment on January 29, 2001. The YWCA employs Court Advocates to provide advocacy for victims of domestic violence in the criminal justice system. Funding for the Court Advocacy program is provided through grants. In order to receive these grants, the YWCA must accurately document the type and number of services provided to clients. Specifically, the YWCA, through its Court Advocates, must document: (1) every victim telephone call received, (2) every victim who visits the office, and (3) statistical information regarding the disposition of domestic violence cases heard by the courts.

Rogers applied for the Bessemer Court Advocate position in June or July 1999. In her application materials, Rogers claimed that she held an undergraduate Psychology degree from the University of Alabama at Birmingham ("UAB") and that she was pursing a Master's Degree in Agency Counseling. (Pl.'s Dep. at Ex. 2.) While Rogers now admits that she does not have a college degree, (Pl.'s Dep. at pp. 33-36), at the time she sought the Court Advocate position she signed an employment application containing the following certification:

> I certify that answers given are true and complete to the best of my knowledge. In the event of employment, I understand that false or misleading information given in my application or interviews may result in my discharge. I authorize investigation of all statements in this application for employment.

(Pl.'s Dep. at 34 & Ex. 2.)

Rogers was hired for the Bessemer Court Advocate position by Elizabeth Baird Crawford ("Crawford"), the YWCA's Director of Domestic Violence Services ("Director"). As Director, Crawford supervised all of the employees in the YWCA's domestic violence program, including those employees who worked in the Court Advocate program. She recommended Rogers for the Court Advocate job, in part, because her academic qualifications set her apart from the other applicants.

Generally, the Court Advocates reported directly to the Court Advocate Supervisor ("Advocate Supervisor") who, in turn, reported to Crawford. Approximately three months after Rogers began her employment, however, the Advocate Supervisor position was vacated and Rogers began reporting directly to Crawford. This arrangement continued for approximately six months. Because of Crawford's duties as Director, there is evidence that Crawford did not have sufficient time to thoroughly supervise the Court Advocates.

In the summer of 2000, Crawford resigned from her position. The YWCA hired Jeannie Ingram ("Ingram") to replace Crawford, as Director, and hired Stacie Barnett ("Barnett") for the Advocate Supervisor position. After only a few months on the job, Barnett had to complete a performance evaluation for Rogers. In that evaluation, Barnett made the following notations:

> [I]t is critical that Sharon communicate with her supervisor regarding inability to attend meetings, the status of the Bessemer office, etc. It is _most_ understandable that Sharon's absence from staff meetings on occasion has been due to court dates, vacation, etc. Generally, Sharon is in attendance if possible.

(Pl.'s Ex. 2.) Overall, Rogers received one "satisfactory" rating, eight ratings of "above

standard," and four ratings of "exceptional" on her performance evaluation. However, Barnett noted that she had served for only a short period of time in her position and, therefore, she was not "completely aware of the full-extent of [Rogers'] job performance." (Pl.'s Ex. 2.)

### B.     Record Keeping Reporting Problems

Shortly after Barnett completed the performance evaluation, YWCA officials began to observe several incidents which indicated that Rogers was failing to adequately fulfill her job responsibilities. First, the YWCA hired Leigh Gwathney ("Gwathney") as a part-time employee to assist Rogers with her duties. Near the end of September 2000, however, Gwathney reported that not enough work existed for her in the Bessemer court. Indeed, Gwathney claimed that the Bessemer Court did not provide sufficient work for Rogers.

In response to Gwathney's comments, YWCA officials reviewed Rogers' monthly statistics and discovered a number of inconsistencies between Rogers' verbal reports about the number of clients she assisted and her monthly documentation. In October 2000, Ingram and Barnett met with Rogers for the purpose of discussing her job performance and clarifying what was expected of her as a Court Advocate. (Pl. Dep. 69-70.)

During this meeting, Rogers explained that she was teaching a class at UAB on Tuesday afternoons. (Pl. Dep. 75-76.) Ingram and Barnett expressed concern that Rogers had not obtained permission to teach during her YWCA office hours. In response, Rogers claimed that she had obtained approval from former Director Crawford, prior to her departure.

Later, when Rogers submitted her call intake forms and monthly statistics, Barnett noticed several inconsistencies between the numbers verbally reported by Rogers and the

numbers reported on her forms, as well as the statistics reported by the Bessemer Court. Barnett also learned from a friend, who is a Professor at UAB, that Rogers was actually a student at UAB, not a professor. Ingram and Barnett claim that they met with Rogers again about her job performance, but Rogers does not recall this meeting.

On December 5, 2000, Rogers received a written warning, in the form of a two-page letter, from Barnett expressing her concerns about the quality of Rogers' job performance and reporting activities. (Pl. Dep. at 64-65, Ex. 7.) In the letter, Barnett explained that she was "not sure how to interpret [Rogers'] unwillingness to fulfill [her] job responsibilities, but [Rogers'] conduct clearly appear[ed] to be insubordination. I hope you prove me wrong." (*Id.*) Rogers responded by signing the letter and noting that she was not in total agreement with the issues raised therein. (*Id.*)

At some point, Ingram and Barnett expressed concerns about Rogers' failure to attend court sessions in Midfield, which began at 5:00 p.m. on Tuesdays. Rogers objected to attending Midfield court, purportedly, because it conflicted with her Tuesday night victim support group and she did not want to reschedule the support group. Durham subsequently called UAB and discovered that Rogers did not have an undergraduate degree and she was not teaching a class, but instead she was enrolled as a student in a course that met until 5:30 p.m. on Tuesdays. (*See* Pl.'s Dep. at Ex. 3, 16.)

On January 12, 2001, when Rogers' job performance and record keeping failed to improve, Ingram and Barnett met with Rogers to discuss her schedule and job performance. The two supervisors also presented Rogers with a copy of her court schedule, which Rogers signed and agreed to follow, with some modifications. (Pl. Dep. at 101-3 & Ex. 9.) After Rogers spoke

to the YWCA's Associate Director, Dr. Connie Hill, about the matter, Rogers met with Ingram, Barnett and the Hill at the latter's request. The women shifted some of Rogers' duties with respect to the Bessemer area courts to other Court Advocates.

      The following Sunday, Barnett contacted Rogers about attending court sessions in Birmingham on Wednesday at 8:00 a.m. At some point, Rogers indicated that she could not attend the court session because she had three previously scheduled appointments that she was unable to reschedule. When Barnett expressed frustration over Rogers' job performance to Durham and Annie Caudle ("Caudle"), the YWCA Building Operation Director, Caudle volunteered to call the YWCA's security service and have the service observe Rogers. Specifically, the YWCA officials wanted to determine if Rogers actually had appointments on Wednesday and whether she was performing her job duties.

### C.    Rogers' Termination

      Sandgaurd, the YWCA security service, hired two ex-convicts to observe Rogers. There is no evidence, however, that might establish that the YWCA was aware Sandgaurd would hire two ex-convicts to conduct the surveillance. The two security personnel reported that Rogers did not have any appointments in her office on Wednesday, and that she had only left the building for twenty minutes around lunch time. Later, Rogers observed the two Sandgaurd personnel following her. In their amateurish effort to closely follow Rogers, the two Sandgaurd personnel forced Rogers' car off the road. (Pl.'s Dep. at 125-38.) The following day, she saw one of the security personnel in the Bessemer courthouse and later, she observed the two security personnel following her again. She reported the incidents to the police and to personnel who worked in the

Bessemer courthouse. On Friday, a YWCA official called to ask Rogers why she had missed a meeting and Rogers reported that she was upset because she was being followed. YWCA officials told Rogers to take the rest of the day off and come to the office on Monday, January 29, 2001 at 8:00 a.m.

When Rogers arrived for the Monday meeting, Ingram offered to allow Rogers to resign, rather than be terminated. Rogers, on the other hand, remembers Ingram asking how Rogers was doing and whether she wanted to resign because she was stressed. Rogers did not understand that she was being terminated. The following day, Ingram sent Rogers a letter confirming their meeting the prior day and informing Rogers that her employment had been terminated. (Pl.'s Dep. at Ex. 10.)

## II. ANALYSIS

### A. Section 1981 Claims

Rogers points to nothing in the record from which a fact finder might determine that she was treated less favorably than white Court Advocates with respect to discipline or termination. Defendants proffer ample evidence that Rogers failed to fulfill her job duties. In response, Rogers simply submits a non-notarized copy of a declaration in which she says she is unaware of the YWCA hiring security personnel to follow white employees. (Pl.'s Ex. 1.) Thus, according to Rogers, her "comparators consist of then present employees of various positions and employees who previously held the position of Court advocate." (Pl.'s Br. at pp. 7-8.)

Rogers' argument misses this mark; she cannot survive a motion for summary judgment simply by relying on general allegations. *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d

587, 592 (11th Cir. 1995) ("Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment."). Rather, Rogers must point to specific white employees who were "similarly situated in all aspects" or whose "conduct was of comparable seriousness to" her conduct. *See Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997). First, with respect to the YWCA's decision to hire Sandgaurd for surveillance, Rogers does not demonstrate that: white employees had performance problems of the same magnitude; that white employees submitted documentation that was suspicious; that white employees were either attending class or teaching classes during work hours; or that the YWCA became aware that a white employee had lied about her educational accomplishments on her resume and employment application. Finally, with respect to the termination, Rogers has not demonstrated that a white Court Advocate failed to attend a court session because of purported appointments, but the YWCA later discovered the employee had no appointments and did not leave the office for the day. Given Rogers' failure to point to more favorable treatment of a white Court Advocate under circumstances similar to her own, Rogers has failed to present evidence from which a jury might find that the reasons for the YWCA's actions were pretextual. Therefore, the YWCA is entitled to summary judgment on Rogers' race discrimination claim.

**B.     Defamation Claim**

Rogers claims that the YWCA defamed her when an unidentified YWCA official purportedly made statements to a potential employer warning it not to hire her. To establish a claim for defamation under Alabama law, Rogers must prove "1) a false *and* defamatory statement concerning the plaintiff; 2) an unprivileged communication of that statement to a third

party; 3) fault amounting at least to negligence on the part of the defendant; and 4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication of the statement." *McCaig v. Talladega Pub. Co.*, 544 So. 2d 875, 877 (Ala. 1989) (emphasis in original and citation omitted). Rogers cannot succeed on her defamation claim for two reasons.

First, Rogers has not pointed to any comments made by the YWCA that are false. Indeed, the record establishes that Rogers continued to mislead potential employers regarding her educational and professional accomplishments. After her termination by the YWCA, Rogers submitted a resume to a potential employer that indicates Rogers obtained a Bachelor of Science degree in Psychology, from UAB, as well as an Associate's Degree in Counseling from Harvey College in Chicago, Illinois. (Pl.'s Dep. at pp. 187-90 & Ex.13.) In her deposition, however, Rogers admitted that she had not actually received a degree from UAB or Harvey College. (Pl.'s Dep. at pp. 187-90.) Thus, to the extent that the YWCA commented on inconsistencies and inaccuracies with reference to Rogers' resume or the YWCA's reasons for the termination, Rogers has failed to present evidence to suggest that those alleged statements by the YWCA were false.

Second, Rogers' defamation claim fails because she has not presented evidence which might establish that the YWCA's communications with future employers were unprotected by privilege. *See Willis v. Demopolis Nursing Home, Inc.*, 336 So.2d 1117 (Ala.1976) (examining whether a qualified privilege applied to statements by plaintiff's former employer to a potential employer about the reasons for plaintiff's termination) (citations omitted).

### C.     Intentional Infliction of Emotional Distress/Outrage Claim

Rogers also alleges that the YWCA is liable for intentional infliction of emotional distress ("outrage").  "Th[e Alabama Supreme] Court has consistently held that the tort of outrage is a very limited cause of action that is available only in the most egregious circumstances." *See, e.g., Thomas v. BSE Indus. Contractors, Inc.*, 624 So. 2d 1041, 1044 (Ala. 1993).  Accordingly, to date the "cases in which the Alabama Supreme Court has found a jury question on an outrage claim have fallen within only three categories: (1) cases having to do with wrongful conduct in the context of family burials, (2) a case where insurance agents employed heavy-handed, barbaric means in attempting to coerce the insured into settling an insurance claim, and (3) a case involving egregious sexual harassment." *Id.* at 1044 (citations omitted). To establish a claim for outrage, Rogers must show that the YWCA's conduct "(1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it." *Green Tree Acceptance v. Standridge*, 565 So. 2d 38, 44 (Ala. 1990).

Rogers fails to establish a prima facie case for outrage because she has not shown that the YWCA's hiring of Sandgaurd to conduct surveillance could be characterized as extreme and outrageous.  "By extreme [the Alabama Supreme Court] refer[s] to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *American Road Serv. Co. v. Inmon*, 394 So. 2d 361, 365 (Ala. 1980).  Without evidence that the YWCA had some reason to suspect that Sandgaurd might engage in potentially dangerous or seriously inappropriate conduct, no reasonable fact finder could determine that the YWCA's decision to hire Sandgaurd,

simply for the purpose of conducting surveillance, was "so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *See id*. Thus, her outrage claim is without merit.

D.  **Negligent Hiring, Training, Supervision and Retention Claims**

Rogers claims that the YWCA was negligent in its hiring, training, supervision, and retention of Durham, Ingram, Barnett, and Sandgaurd. In order to establish a negligent hiring claim, Plaintiff "must present substantial evidence indicating that [the employer] had notice or knowledge (actual or presumed) of the alleged incompetency of" the employee. *Hargrove v. Tree Life Christian Day Care Center*, 699 So. 2d 1242, 1247-48 (Ala. 1997); *see also Sanders v. Shoe Show, Inc.*, 778 So. 2d 820, 824 (Ala. Civ. App. 2000). Rogers does not meet this standard because she has failed to present any evidence that the YWCA had notice that Durham, Ingram and Barnett were incompetent. Even with regard to the bumbling "private detectives" secured by Sandgaurd, Rogers fails to demonstrate that the YWCA had actual or constructive knowledge regarding the alleged incompetency of Sandgaurd or its employees. Accordingly, the negligent, hiring, training, supervision and retention claims are without merit.

## CONCLUSION

For the reasons enunciated above, the YWCA is entitled to summary judgment on all claims asserted by Rogers and all claims asserted against the remaining defendants are due to be dismissed.

The Court will enter an order embodying these conclusions and granting the appropriate

relief.

DONE this _28th_ day of February, 2003.

_____
Chief United States District Judge
U. W. Clemon